PHILLIP A. TALBERT
United States Attorney
KEVIN C. KHASIGIAN
JUSTIN L. LEE
Assistant U. S. Attorneys
501 I Street, Suite 10-100
Sacramento, CA  95814
Telephone: (916) 554-2700

Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>APPROXIMATELY $1,697,930.94 SEIZED FROM RIVER CITY BANK ACCOUNT NUMBER 711013985, HELD IN THE NAME OF WESTERN BALER & CONVEYOR, INC., AND<br><br>APPROXIMATELY $230,000.00 SEIZED FROM WELLS FARGO BANK ACCOUNT NUMBER 4252762455, HELD IN THE NAME OF ENTERPRISE BALER COMPANY,<br><br>　　　　　Defendants. | STIPULATION FOR CONSENT JUDGMENT OF FORFEITURE |

　　　The United States of America and potential claimants Daniel Stewart ("Stewart" or "claimant") and Luke Burroughs ("Burroughs" or "claimant"), by and through their respective counsel, hereby agree and STIPULATE as follows:

　　　1.　　On or about October 1, 2020, agents with the Internal Revenue Service – Criminal Investigation ("IRS") seized Approximately $1,697,930.94 from River City Bank Account Number 711013985, held in the name of Western Baler & Conveyor, Inc. pursuant to a federal seizure warrant. On or about October 2, 2020, agents with the IRS seized Approximately $230,000.00 from Wells Fargo Bank Account Number 4252762455, held in the name of Enterprise Baler Company pursuant to a federal

seizure warrant (hereafter collectively the "defendant funds").

2. For the purposes of this settlement only, claimants do not dispute the United States' representation that Stewart and Burroughs are the co-owners of a Western Baler and Conveyor ("WBC"), a business based in Rocklin, California that sells and services industrial conveyor belt systems for solid waste disposal companies and municipal recycling centers. WBC grosses several million dollars annually. Beginning in at least 2016, Stewart and Burroughs conspired to decrease their personal and company tax burdens by disguising personal expenses as company expenses.

3. For the purposes of this settlement only, claimants do not dispute the United States' representation that Stewart remodeled his home, installed horse stables, and built a swimming pool and paid for all of it through WBC checks that disguised the payments to look like company expenses, thereby reducing WBC's profits and tax liabilities. At the same time, Stewart and Burroughs padded WBC expenses with personal expenses that allowed them to receive off-the-books cash kickbacks.

4. For the purposes of this settlement only, claimants do not dispute the United States' representation that on February 6, 2018, a confidential informant ("CI") working for the IRS met with Stewart at WBC's office in Rocklin. During this meeting, and all subsequent meetings, the CI was wearing a concealed audio recording device to record the meeting. The CI gave Stewart $18,000 in cash in exchange for a WBC company check for $19,800 payable to the CI's fictitious business. The CI observed Stewart immediately break the $18,000 in cash into two $9,000 bundles, placing one $9,000 bundle on Burroughs's desk and keeping one $9,000 bundle for himself. Stewart also gave the CI a second WBC check for $28,337.32 to pay for labor and materials for a recent contracting job at Stewart's personal residence in Lincoln, California. Each check was made payable to the CI's fictitious business, which they created at Stewart's specific request. The CI's fictitious business was not a real business, it was just a registered business and a bank account that the CI used to receive checks from Stewart.

5. For the purposes of this settlement only, claimants do not dispute the United States' representation that on February 16, 2018, the CI met again with Stewart at WBC's office in Rocklin. Similar to the February 6, 2018 meeting, the CI gave Stewart $20,000 in cash in exchange for a $22,000 WBC check. On March 23, 2018, the CI once again met with Stewart at WBC's Rocklin offices. The CI gave Stewart $19,000 in cash in exchange for a $20,900 company check. Burroughs was present inside

Stewart's office for this meeting. On April 12, 2018, the CI met with Stewart at WBC's office, and the CI gave Stewart $20,000 in cash in exchange for a $22,000 WBC check. Burroughs was present inside Stewart's office and Stewart handed half of the money to Burroughs in front of the CI. On May 16, 2018, the CI met with Burroughs at WBC's office. The CI gave Burroughs $20,000 in cash in exchange for a $22,000 company check. On October 13, 2018, the CI met with Burroughs at WBC's office. The CI gave Burroughs $13,000 in cash in exchange for an $11,000 company check.

6. For the purposes of this settlement only, claimants do not dispute the United States' representation that during several of the meetings between the CI and Stewart, Stewart told the CI that he was interested in doing more cash for check exchanges. The CI had previously told Stewart that he could only generate so much cash through his business. At the request of investigators, the CI introduced a new idea that would generate more cash. On February 14, 2019, the CI met with Stewart at WBC's office. Burroughs was present for some, but not all, of the meeting. The CI told Stewart that he had a friend that sold marijuana and wanted to turn the drug money into legitimate money. The CI explained that his friend could do $100,000 in cash at a time. Stewart told the CI that it is illegal to grow marijuana in the United States and that money from marijuana is "drug money." Nonetheless, Stewart told the CI, "to be honest, this would work out for us."

7. For the purposes of this settlement only, claimants do not dispute the United States' representation that on March 13, 2019, an undercover agent ("UC") and the CI met with Stewart and Burroughs at WBC's office. The UC posed as a marijuana dealer who sold California-grown marijuana in New Jersey. During the meeting, the UC gave Stewart $50,000 in cash in exchange for a WBC company check for $50,233.00 payable to a fictitious company created by the UC. During the meeting, the UC and Stewart discussed the UC's marijuana business and how they could convert cash proceeds from marijuana sales into legitimate money via WBC company checks. At one point, Stewart told the UC that prior to the CI approaching Stewart about the UC, Stewart and Burroughs had already discussed finding someone with a grow operation so that they could work that angle. Stewart suggested to the UC that they could use the sale of a used piece of equipment known as a baler as cover for the financial transaction. As part of this cover story, Stewart advised the UC to create a fake invoice on letterhead for the used baler to make it look more legitimate.

3

8. For the purposes of this settlement only, claimants do not dispute the United States' representation that on April 17, 2019, the UC and the CI met Stewart at WBC's office in Rocklin. The UC gave Stewart $155,000 in cash in exchange for a WBC company check for $155,000. During the meeting, Stewart had the UC take a picture of the serial number of a used baler on the WBC lot and sent it back to Stewart as the purported serial number of the used baler that the UC was "selling" to WBC.

9. On June 26, 2019, the UC met Stewart and Burroughs at Strikes Unlimited, a bowling alley in Rocklin, California. The UC met Stewart and Burroughs in Burroughs' truck. The UC split $86,000 in cash in half and gave $43,000 each to Stewart and Burroughs. Burroughs then handed the UC a WBC company check for $86,000, signed by Burroughs. Stewart had signed all previous checks given to the UC and CI.

10. On August 14, 2019, the UC met again with Stewart and Burroughs at Strikes Unlimited in Rocklin to deliver $125,000 in cash in exchange for a WBC company check. The UC told Stewart and Burroughs that the $125,000 in cash was proceeds of the interstate sale of marijuana and ecstasy. On October 24, 2019, the UC met with Stewart at Strikes Unlimited. The UC gave Stewart $120,000 in cash in exchange for a WBC company check endorsed by Burroughs. On December 16, 2019, a new special agent working in an undercover capacity ("UC#2") met with Stewart and Burroughs at WBC. UC#2 gave Stewart $146,000 in cash in exchange for a WBC company check.

11. For the purposes of this settlement only, claimants do not dispute the United States' representation that on October 1, 2020, agents with the IRS arrested Stewart in the parking lot of Strikes Unlimited in Rocklin, California. Stewart thought he was meeting with the UC to exchange $350,000 in purported drug proceeds for a corporate check drawn on one of Stewart's businesses. Agents searched Stewart's vehicle and found two checks, each made out to Camelback Consulting, Inc., the UC's shell business used to cash the checks from Stewart and Burroughs.

12. For the purposes of this settlement only, claimants do not dispute the United States' representation that Stewart and Burroughs wrote six checks to Camelback Consulting, Inc. in exchange for cash, which were represented as drug proceeds. One of the checks seized from Stewart's vehicle was from WBC for $120,017, drawn on River City Bank account number ending in 3985. The other check seized from Stewart's vehicle was from Enterprise Baler Company, in the amount of $230,000, drawn on

Wells Fargo Bank account number ending in 2455. The memo section of the check stated "used baler." The total dollar amount of both checks was $350,017.

13. On October 15, 2020, Stewart and Burroughs were criminally charged in the Eastern District of California for violations of the federal money laundering statutes. Stewart and Burroughs have since pleaded guilty to committing federal crimes and agreed to forfeit the defendant funds as property involved in their illegal money laundering activity.

14. Without admitting the truth of the factual assertions contained in this stipulation, claimants specifically denying the same, and for the purpose of reaching an amicable resolution and compromise of this matter, claimants agree that an adequate factual basis exists to support forfeiture of the defendant funds to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and 21 U.S.C. § 881(a)(6). Stewart and Burroughs hereby acknowledge that they are the sole owners of the defendant funds, and that no other person or entity has any legitimate claim of interest therein. Should any person or entity institute any kind of claim or action against the government with regard to its forfeiture of the defendant funds, claimants shall hold harmless and indemnify the United States, as set forth below.

15. This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1345 and 1355, as this is the judicial district in which acts or omissions giving rise to the forfeiture occurred.

16. This Court has venue pursuant to 28 U.S.C. § 1395, as this is the judicial district in which the defendant funds were seized.

17. The parties herein desire to settle this matter, and a Consent Judgment of Forfeiture may be entered based upon the following terms with which claimants expressly agree:

    a. All right, title, and interest of Daniel Stewart and Luke Burroughs in the following assets, plus all accrued interest, shall be forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and 21 U.S.C. § 881(a)(6), to be disposed of according to law:

        i. Approximately $1,697,930.94 seized from River City Bank Account Number 711013985, held in the name of Western Baler & Conveyor, Inc., and

        ii. Approximately $230,000.00 seized from Wells Fargo Bank Account Number 4252762455, held in the name of Enterprise Baler Company.

    b. Claimants hereby release the United States of America and its servants, agents, and employees and all other public entities, their servants, agents, and employees, from any and all

liability arising out of or in any way connected with the seizure or forfeiture of the defendant funds. This is a full and final release applying to all unknown and unanticipated injuries, and/or damages arising out of said seizure or forfeiture, as well as to those now known or disclosed.  The parties to this agreement agree to waive the provisions of California Civil Code § 1542, which provides: "A general release does not extend to claims which the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

   c. Pursuant to Rules 408 and 410(a)(4) of the Federal Rules of Evidence, no portion of this stipulated settlement, including statements or admissions made herein, shall be admissible in any criminal action.

   d. Each party represents that he or she understands the content of this Stipulation and enters it voluntarily and has not been influenced by any person acting on behalf of any other party.

   e. All parties will bear their own costs and attorney's fees.

DATED: 2/23/2024

PHILLIP A. TALBERT
United States Attorney

/s/ Kevin C. Khasigian
KEVIN C. KHASIGIAN
Assistant U.S. Attorney

DATED: 2/1/24

/s/ Daniel Stewart
DANIEL STEWART
Potential claimant

DATED: 2/1/24

/s/ David Fischer
DAVID FISCHER
Attorney for claimant Daniel Stewart

DATED: 2-1-24

/s/ Luke Burroughs
LUKE BURROUGHS
Potential claimant

DATED: 2/1/24

/s/ Candice Fields
CANDICE FIELDS
Attorney for claimant Luke Burroughs

(Signatures retained by attorney)